

FILED IN CLERK'S OFFICE

MAR 18 2005

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,          :

        Plaintiff,          :

        v.          :

$43,314 29 SEIZED FROM TRUSTMARK:
BANK ACCOUNT XXXX6301;          :
$2,545.46 SEIZED FROM FIDELITY          :
NATIONAL BAN ACCOUNT XXXX1837;   :
$90,325.22 SEIZED FROM FIDELITY :
NATIONAL BANK ACCOUNT XXXX4838; :
$12,273.91 SEIZED FROM FIDELITY :
NATIONAL BANK ACCOUNT XXXX8581; :
$12,239.21 SEIZED FROM FIDELITY :
NATIONAL BANK ACCOUNT XXXX8570; :
$61,142.50 SEIZED FROM FIDELITY :
NATIONAL BANK ACCOUNT XXXX6040;   :
$588,530.15 SEIZED FROM FIDELITY:
NATIONAL BANK ACCOUNT XXXX2905; :
$77,525.72 TRACEABLE TO FIDELITY:
NATIONAL BANK ACCOUNT XXXX2905; :
$47,503 44 SEIZED FROM FIDELITY :
NATIONAL BANK ACCOUNT XXXX1904;   :
$164,778.88 SEIZED FROM FIDELITY.
NATIONAL BANK ACCOUNT XXXX1310; :
$162,954.61 SEIZED FROM FIDELITY
NATIONAL BANK ACCOUNT XXXX9514; :
$56,662.54 SEIZED FROM WACHOVIA :
BANK ACCOUNT XXXX5747;          :
NEW YORK LIFE INSURANCE POLICY :
XXXX8780; AND NEW YORK LIFE
INSURANCE POLICY XXXX8796,          :

            :

        Defendants.          :

CIVIL ACTION

NO. 1:05-CV-0741

BBM

FORMS
Consent
Pretrial Instructions
Title VI/NC
By:

## COMPLAINT FOR FORFEITURE

COMES NOW the United States of America, the Plaintiff in this matter, and shows the Court the following in support of its Complaint for Forfeiture:

1.    This Court has jurisdiction and venue over this claim by virtue of 28 U.S.C. §§ 1345, 1355, and 1395.

2    This is a civil action in rem to enforce the provisions of 18 U.S.C. § 981(a)(1)(A) and (C), 18 U.S.C.  § 1956(a)(1)(A)(i) and (B)(i), and 8 U.S.C. § 1324 (a) and (b) for forfeiture of the following funds:

> (A)   $43,314.29 in U S. currency seized from Trustmark Bank account number XXXX6301, held in the name of Delta MK, LLC, d/b/a Delta Travel Center;
>
> (B)   $2,545.46 in U.S. currency seized from Fidelity National Bank account number XXXX1837, held in the name of Sugar Bear, Inc.;
>
> (C)   $90,325.22 in U.S. currency seized from Fidelity National Bank account number XXXX4838, held in the name of Malik Karimi and Shela Karimi;
>
> (D)   $12,273.91 in U.S. currency seized from Fidelity National Bank account XXXX8581, held in the name of Synergy Petroleum, LLC;

(E)   $12,239.21 in U S  currency seized from Fidelity
      National Bank account XXXX8570, held in the name of
      Apex MK, LLC;

(F)   $61,142.50 in U.S. currency seized from Fidelity
      National Bank account XXXX6040, held in the name of
      Century MK, LLC;

(G)   $588,530 15 in U.S. currency seized from Fidelity
      National Bank account XXXX2905, held in the name of
      Sugar Bear, Inc.;

(H)   $77,525.72 in U.S. currency traceable to Fidelity
      National Bank account XXXX2905, held in the name of
      Sugar Bear, Inc.

(I)   $47,503.44 in U.S. currency seized from Fidelity
      National Bank account XXXX1904, held in the name of
      Chappell MK, LLC;

(J)   $164,778.88 in U.S. currency seized from Fidelity
      National Bank account XXXX1310, held in the name of
      Henrico MK, LLC;

(K)   $162,954.61 in U S  currency seized from Fidelity
      National Bank account XXXX9514, held in the name of
      Sugar Bear, Inc.;

(L)  $56,662.54 in U.S. currency seized from Wachovia Bank account number XXXX5747, held in the name of Malik Karimi and Shela Karimi;

(M)  New York Life Insurance Policy number XXXX8780, held in the name of Malik M. Karimi;

(N)  New York Life Insurance Policy number XXXX8796, held in the name of Malik M. Karimi

(collectively the Defendant Properties).

3.   On or about November 9, 2004, Special Agents with the United States Department of Homeland Security, Immigration and Customs Enforcement seized the Defendant Properties.

4.   The Defendant Properties remain in the Northern District of Georgia.

<u>THE FACTS SUPPORTING FORFEITABILITY</u>

5.   Since approximately 1979, Malik Karimi and Mansoor Karimi have been involved in business ventures that own and operate gas station/convenience store locations in the metro Atlanta area.

6.   The following corporations and LLC's are associated with Malik Karimi and/or Mansoor Karimi and are all businesses entities involved in some way in the gas station/convenience store industry: Sugar Bear, Inc., Henrico MK, LLC, Boulevard C-Store, Inc., Century MK, LLC, Delta MK, LLC, Chappell MK, LLC, and Synergy Petroleum MK, LLC.

7.   Prior to 1997, business ventures associated with Malik and Mansoor Karimi owned and operated gas station locations.

8.   Since at least the early 1990s, business ventures associated with Malik Karimi and Mansoor Karimi have used undocumented alien labor to staff the gas station/convenience store locations and their corporate offices.

9.   In or about 1997 and thereafter, businesses associated with Malik Karimi and Mansoor Karimi began leasing gas station/convenience store locations to other corporations, LLC's and individuals.

10.   Among those corporations, LLC's, and individuals leasing gas station/convenience store locations from Malik Karimi and Mansoor Karimi's businesses were the following:  Darvee Business Services, LLC, a corporation associated with Vishwanath Rao; Shop Services, Inc. and Station Services, Inc., corporations associated with Rafiq Devji; KHM, Inc., a corporation associated with Habibullah Hemani; AAAIR, Inc , a corporation associated with Amanullah Devji; Overseas Enterprises, Inc., a corporation associated with Nawz Sharif; J.F.R., LLC, a corporation associated with Lony Ahsan; FFBE, LLC (a/k/a FEBE, LLC), a corporation associated with Syed Hossain; Continental Craft USA, Inc., a corporation associated with Abdul Hamid, In Tradeco, Inc. (a/k/a Intradeco, Inc.), a corporation associated with Samad Shaikh; and

Malls, LLC, a corporation associated with Shezad Ismail (collectively the Lessees).

11. When the Lessees took control of gas station/convenience store locations from businesses associated with Malik Karimi and Mansoor Karimi, the Lessees often inherited legacy pools of undocumented workers.

12. Using undocumented alien employees to staff gas station/convenience store locations gave the businesses associated with Malik Karimi, Mansoor Karimi, and the Lessees unfair advantages against their competitors by reducing labor costs significantly.

13 The businesses associated with Malik Karimi, Mansoor Karimi, and the Lessees reduced their labor costs using many methods, including failing to pay overtime compensation to undocumented alien workers who worked more than 40 hours per week, sometimes failing to withhold applicable state and federal taxes, and failing to make appropriate insurance benefit contributions.

14. As with other successful commercial operations, businesses associated with Malik Karimi, Mansoor Karimi, and the Lessees gas stations/convenience stores operated, generated gross revenues, deposited those gross revenues into operating accounts, and used at least a portion of those gross revenues to satisfy their operating expenses.

15.   Consequently, the savings that the business associated with Malik Karimi, Mansoor Karimi, and the Lessees achieved from unlawfully employing undocumented alien workers, that is, the proceeds of their violations of 8 U.S.C. § 1324(a), were held in their operating accounts.

16.   Over time, tainted funds drawn from various Lessee operating accounts were transferred into Sugar Bear Inc.'s Fidelity Bank Account No. XXXX9514 to pay lease payments, loans, and other business expenses.

18.   After the tainted funds were transferred from Lessee operating accounts to Sugar Bear Inc.'s Fidelity Bank Account No. XXXX9514, they passed over time into Fidelity Bank Account No. XXXX1904, an account held in the name of Chappell MK, LLC.

19.   Likewise, tainted funds drawn from Sugar Bear Inc.'s Fidelity Bank Account No. XXXX9514 were also transferred into Fidelity Bank Account No. XXXX4838, an account held in the names of Malik Karimi and Shela Karimi.

20.   Additionally, over time tainted funds passed from Sugar Bear Inc 's Fidelity Bank Account No. XXXX9514 into Fidelity Bank Account No  XXXX8570, an account held in the name of Apex MK, LLC.

21.   Tainted funds were also transferred from Sugar Bear Inc 's Fidelity Bank Account No. XXXX9514 into Fidelity Bank

Account No. XXXX6040, an account held in the name of Century MK, LLC.

22   Likewise, tainted funds were transferred from Sugar Bear Inc.'s Fidelity Bank Account No. XXXX9514 into Fidelity Bank Account No. XXXX8581, an account held in the name of Synergy Petroleum, LLC.

23.  After tainted funds arrived in Sugar Bear Inc.'s Fidelity Bank Account No. XXXX9514, funds were then transferred into Fidelity Bank Account No. XXXX1837, the payroll account for Sugar Bear Inc.

24.  Over time, tainted funds were transferred from Sugar Bear Inc.'s Fidelity Bank Account No. XXXX1837 into Wachovia Bank Account No. XXXX5747, an account held in the names of Malik Karimi and Shela Karimi.

25.  Additionally, funds drawn from Sugar Bear Inc.'s Fidelity Bank Account No. XXXX9514 were transferred into Fidelity Bank Account No. XXXX1310, held in the name of Henrico MK, LLC.

26.  Thereafter, tainted funds drawn from Fidelity Bank Account No. XXXX1310 were transferred into TrustMark Bank Account No. XXXX6301, held in the name of Delta MK, LLC.

27   After tainted funds arrived in Delta MK, LLC's TrustMark Bank Account No. XXXX6301, they were then transferred into Fidelity

Bank Account No. XXXX2905, an account held in the name of Sugar Bear Inc.

28. Additionally, tainted funds drawn from Fidelity Bank Account No. XXXX1310 were also transferred into New York Life Insurance Policy XXXX8780, held in the name of Malik M. Karimi.

29 Likewise, tainted funds drawn from Fidelity Bank Account No XXXX1310 were also transferred into New York Life Insurance Policy XXXX8796, also held in the name of Malik M. Karimi.

30. The financial transactions described in paragraphs 16, 19, 21, 22, 23, 24, 25, 28, and 29 occurred for the purpose of promoting violations of 8 U.S.C § 1324(a).

31. The financial transactions described in paragraphs 18 through 29 of this Complaint occurred for the purpose of concealing and disguising the nature, location, source, ownership, or control of proceeds traceable to violations of 8 U.S.C. § 1324(a) and 1956(a)(1)(A)(i) and (B).

32. Additional information concerning the criminal activities of Malik Karimi, Mansoor Karimi, Sugar Bear, Inc., Henrico MK, LLC, Boulevard C-Store, Inc., Century MK, LLC, Synergy Petroleum MK, LLC, and the Lessees and the financial transactions forming the basis of this Complaint appears in the Affidavit of Shawn Harwood, attached hereto as Exhibit 1 and incorporated herein by reference.

## THE STATUTORY BASIS FOR FORFEITURE

32.   Based on the above, the Defendant Properties are subject to forfeiture to the United States pursuant to 8 U.S.C. § 1324(b) as gross proceeds of violations of 8 U.S.C. § 1324(a) or property traceable thereto.

33.   Additionally,  based  on  the  above,  the  Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) as property that constitutes or is derived from proceeds traceable to specified unlawful activities, that is, violations of 8 U.S.C. § 1324(a) or 1956, or a conspiracy to commit such an offense.

34.   Finally, based on the above, the Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C)  as  property  that  constitutes  or  is  derived  from proceeds traceable to a specified unlawful activity, that is, violations of 8 U.S.C. § 1324(a), or a conspiracy to commit such an offense.

**WHEREFORE**, the United States prays:

(1) That an order issue Defendant Properties to the United States;

(2) That Plaintiff be awarded the costs of this action; and

(3) That the Court award such other and further relief as it

deems just and proper.

Respectfully submitted,

DAVID E. NAHMIAS
UNITED STATES ATTORNEY

JENNY R. TURNER
ASSISTANT U.S. ATTORNEY
GEORGIA BAR NO. 719439

600 U.S. COURTHOUSE
75 SPRING STREET, S.W.
ATLANTA, GEORGIA 30303
404-581-6084
404-581-6234 FAX

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,           :
                                    :        CIVIL ACTION
                Plaintiff,          :
                                             NO.
        v.                          :
                                    :
$43,314.29 SEIZED FROM TRUSTMARK:
BANK ACCOUNT XXXX6301;              :
$2,545.46 SEIZED FROM FIDELITY      :
NATIONAL BAN ACCOUNT XXXX1837;      :
$90,325.22 SEIZED FROM FIDELITY     :
NATIONAL BANK ACCOUNT XXXX4838;     :
$12,273 91 SEIZED FROM FIDELITY
NATIONAL BANK ACCOUNT XXXX8581;     :
$12,239.21 SEIZED FROM FIDELITY     :
NATIONAL BANK ACCOUNT XXXX8570;     :
$61,142.50 SEIZED FROM FIDELITY     ·
NATIONAL BANK ACCOUNT XXXX6040;     .
$588,530.15 SEIZED FROM FIDELITY:
NATIONAL BANK ACCOUNT XXXX2905;     :
$77,525.72 TRACEABLE TO FIDELITY:
NATIONAL BANK ACCOUNT XXXX2905;     :
$47,503.44 SEIZED FROM FIDELITY     :
NATIONAL BANK ACCOUNT XXXX1904;
$164,778 88 SEIZED FROM FIDELITY:
NATIONAL BANK ACCOUNT XXXX1310;     :
$162,954.61 SEIZED FROM FIDELITY:
NATIONAL BANK ACCOUNT XXXX9514;     :
$56,662.54 SEIZED FROM WACHOVIA     :
BANK ACCOUNT XXXX5747;
NEW YORK LIFE INSURANCE POLICY      .
XXXX8780; AND NEW YORK LIFE         :
INSURANCE POLICY XXXX8796,          :
                                    :
                                    :
                Defendants.         :

## **VERIFICATION**

I, Sabrina Sweat, a Special Agent for the United States

Immigration and Customs Enforcement, have read Plaintiff's

Complaint and all attached exhibits in this action and state that the contents of the Complaint and the exhibits are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This ___16th___ day of March, 2005.

SABRINA SWEAT
SPECIAL AGENT
IMMIGRATION AND CUSTOMS ENFORCEMENT

PLAINTIFF'S
EXHIBIT
1



## AFFIDAVIT

I, Special Agent Shawn Harwood, being duly sworn hereby depose and state as your affiant:

1.  I am a Special Agent in the Atlanta Office of Investigations, National Security Unit, for United States Immigration and Customs Enforcement (ICE-Atlanta). I have been employed as a Federal officer since January 9, 1995, during which time I have held the following positions: Special Agent, Border Patrol Agent, and Economist. As part of my duties and responsibilities I investigate criminal violations of the United States Code, including those listed in Paragraph 3 below, as well as administrative violations of the United States Immigration and Nationality Act.

2.  I make this affidavit, in part, based on personal knowledge collected through surveillance and overt investigation of the targets listed below, and, in part, based on and inclusive of information provided by other sources. Other sources of information include Special Agent Brian McGlamery of the United States Department of Labor, Office of the Inspector General (USDOL), Inspector Travis Barnell of the United States Postal Inspection Service (USPIS), Special Agent Gregory Wiggs of the United States Social Security Administration, Office of the Inspector General (USSSA), several registered Confidential Informants (CIs), who will be described in the text to follow, and various other sources of information. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are not reported verbatim, but in substance and in part. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Rather, I have set forth facts which I believe sufficient to establish probable cause to search the premises listed in Paragraphs 74 - 98 and probable cause to seize the assets listed in Paragraph 115. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## APPLICABLE STATUTES

3.  This affidavit will set forth specific facts and circumstances of the investigation that I believe establish probable cause to believe that, from April 1996 until the present, MALIK KARIMI (d/b/a SUGAR BEAR, INC., HENRICO MK, LLC, CENTURY MK, LLC, SYNERGY PETROLEUM, LLC), MANSOOR KARIMI (d/b/a BOULEVARD C-STORE, INC., SUGAR BEAR, INC., HENRICO MK, LLC, CENTURY MK, LLC, SYNERGY PETROLEUM, LLC); RITU RAO (d/b/a SUGAR BEAR, INC), ROZINA JIVAN (d/b/a SUGAR BEAR, INC), VISHWANATH RAO (d/b/a DARVEE BUSINESS SERVICES, LLC); RAFIQ DEVJI (d/b/a STATION SERVICES, INC, SHOP SERVICES, INC. a/k/a SHOPE SERVICES, INC.); AMINULLAH DEVJI (d/b/a AAAIR, INC.), HABIBULLAH HEMANI (d/b/a KHM, INC.); NAWZ SHARIF (d/b/a OVERSEAS ENTERPRISES, INC.); LONY AHSAN (d/b/a J.F.R., LLC); NAZMUL AHSAN (d/b/a J.F.R., LLC); SYED HOSSAIN (d/b/a FFBE, LLC, a/k/a FEBE, LLC); ABDUL HAMID (d/b/a CONTINENTAL CRAFT USA, INC.); SAMAD SHAIKH (d/b/a IN TRADECO, INC., a/k/a INTRADECO, INC.); SHEZAD ISMAIL (d/b/a MALLS, LLC); and others, both personally and through related business entities, have engaged in ongoing and continuous criminal activities in violation of Title 8, U.S.C., Section 1324(a)(1)(A)(iv), Encouraging and Inducing an Alien to Come to, Enter, or Reside in the United States, Section 1324a(a)(1), Knowingly Hiring for Employment an Unauthorized Alien, and Title 8, U.S.C., Section 1324a(a)(2) Continuing to Employ an Unauthorized Alien Knowing that an Alien is, or has become, an Unauthorized Alien, Title 18, U.S.C., Section 371, Conspiracy to Commit Offense.

## THE BUSINESSES, INDIVIDUALS, AND LOCATIONS INVOLVED

4.   SUGAR BEAR, INC is a business established in or about November 1979, by MANSOOR KARIMI and his two sons, MALIK KARIMI and Ramzan KARIMI (collectively the KARIMIS). In 1997, Ramzan KARIMI separated his business enterprises from his father and brother. MALIK and MANSOOR KARIMI have acquired, operated, and leased combined gas station and convenience store sites through the following business entities

   a.   SUGAR BEAR, INC.
   b.   BOULEVARD C-STORE, INC.
   c.   HENRICO MK, LLC
   d.   CENTURY MK, LLC
   e.   SYNERGY PETROLEUM, LLC

   (hereinafter collectively the **KARIMI ORGANIZATION**).

5   Based on information gathered during the course of this investigation, the following entities, through the officers listed below (hereinafter the Lessees), are believed to lease the following gas station/convenience store locations from the KARIMI ORGANIZATION·

| GAS STATION/ CONVENIENCE STORE | LESSEE CORPORATION/ OFFICER | PROPERTY OWNER/ BUSINESS OFFICER |
|---|---|---|
| Amoco, 575 Chappell Road Atlanta, Georgia 30318 | J.F.R., LLC CEO/RA. LONY ASHAN | SUGAR BEAR, INC. CEO. MANSOOR KARIMI |
| Chevron, 356 Boulevard NE Atlanta, Georgia 30312 | J F.R., LLC CEO/RA. LONY ASHAN | BOULEVARD C-STORE, INC, CEO· MANSOOR KARIMI |
| Chevron, 580 McDonough Boulevard Atlanta, Georgia 30315 | J.F.R., LLC CEO/RA. LONY ASHAN | HENRICO MK, LLC CEO/RA. MALIK KARIMI |
| Shell, 1338 Virginia Avenue College Park Georgia 30344 | ▬▬▬▬▬▬ | MOTIVA ENTERPRISES, LLC CEO/RA. NONE LISTED |
| Amoco, 2964 Moreland Avenue SE Conley, Georgia 30288 | KHM, INC. CEO HABIBULLAH HEMANI | HENRICO MK, LLC CEO/RA: MALIK KARIMI |
| Amoco, 4556 E. Ponce de Leon Avenue, College Park, Georgia 30344 | KHM, INC. CEO HABIBULLAH HEMANI | HENRICO MK, LLC CEO/RA: MALIK KARIMI |
| Chevron, 1105 Holcomb Bridge Road Roswell, Georgia 30076 | ISMAIL, INC CEO. SHEZAD ISMAIL | CENTURY MK, LLC CEO/RA: MALIK KARIMI |
| Chevron, 1105 Holcomb Bridge Road Roswell, Georgia 30076 | DARVEE BUSINESS SERVICES, LLC CEO VISHWANATH RAO | CENTURY MK, LLC CEO/RA· MALIK KARIMI |
| Amoco, 475 Windy Hill Road Marietta, Georgia 30060 | FFBE, LLC CEO/RA SYED HOSSAIN | HENRICO MK, LLC CEO/RA· MALIK KARIMI |
| Exxon, 486 E. Ponce de Leon Avenue Atlanta, Georgia 30308 | OVERSEAS ENTERPRISES, INC CEO NAWZ SHARIF | HENRICO MK, LLC CEO/A MALIK KARIMI |
| Amoco, 1111 Moreland Avenue SE Atlanta, Georgia 30316 | SHOP SERVICES, INC CEO. RAFIQ DEVJI | HENRICO MK, LLC CEO/RA. MALIK KARIMI |

2

| Amoco, 350 Moreland Avenue NE<br>Atlanta, Georgia 30307 | AAAIR, INC.<br>CEO AMANULLAH DEVJI | HENRICO MK, LLC<br>CEO/RA· MALIK KARIMI |
| --- | --- | --- |
| Chevron, 2331 Peachtree Road<br>Atlanta, Georgia 30305 | CONTINENTAL CRAFT, USA, INC<br>CEO, ABDUL HAMID | SYNERGY PETROLEUM, LLC<br>CEO/RA· MALIK KARIMI |
| Amoco, 5625 Buford Highway<br>Doraville, Georgia 30340 | INTRADECO, INC.<br>CEO. SAMAD SHAIKH | CENTURY MK, LLC<br>CEO/RA. MALIK KARIMI |

## OVERVIEW

6       As its business holdings developed, the KARIMI ORGANIZATION began to lease many of its business locations to other individuals and entities. For each location, Lessees pay a fixed monthly payment and forward all proceeds from gasoline sales to the KARIMI ORGANIZATION. Lessees retain all profits derived from sales occurring inside the convenience stores. This arrangement is commonly known in the convenience store business as an "inside/outside" plan. Business-related licenses such as Georgia Lottery licenses and licenses to sell alcohol remain in the name of the KARIMI ORGANIZATION. The KARIMI ORGANIZATION has historically earned substantial proceeds through the illegal employment of foreign nationals present in the United States without permission to work (hereinafter referred to as undocumented alien workers).

7       The use of undocumented alien workers allows an employer to realize a significantly larger profit from the business operation through inexpensive labor. USDOL Special Agent McGlamery provided a labor cost analysis of the employment practices of the KARIMI ORGANIZATION. The analysis found that the KARIMI ORGANIZATION and its Lessees save a significant amount per employee each year principally through the nonpayment of mandatory overtime compensation, Federal and State taxes, insurances, and mandatory contributions. The USDOL labor cost analysis assumes a 65-hour workweek and assumes the employee works an entire year (or is replaced by a similarly paid individual). Undocumented alien workers are paid in two ways. on a "cash-only" basis or by payroll checks utilizing fraudulent Social Security Numbers   In the cash-only scenario, the employer simply compensates the undocumented alien employee in cash, with no additional compensation for overtime hours   This practice saves the employer an estimated $8,000 per employee per year. In the second scenario, the employer pays the employee a salary check for a maximum of 40 hours per week, reporting these wages to the Department of Labor and complying with all employment regulations. All hours subsequent to 40 are paid to the employee in cash and not reported to the Department of Labor. This practice saves the employer an estimated $6,200 per employee per year. While, the second scenario does not maximize the employer's illegal labor cost savings, it does allow the employer to appear compliant with State and Federal labor laws and regulations. Undocumented alien workers are particularly vulnerable to predatory employment practices, as they believe their unlawful Immigration status precludes them from reporting these abuses to law enforcement authorities.

8.      Cash payments made to employees are concealed in the financial records of the KARIMI ORGANIZATION and its Lessees in numerous ways, to include the inflation or fabrication of vendor invoices

9.      The Lessee is directly responsible for personnel employed at the gas station/convenience store and all operations of the business facility. When the Lessee assumes the lease of an existing store, he inherits the pool of employees, which historically includes a portion of undocumented

3

alien workers. In this fashion, the KARIMI ORGANIZATION ███████████████████ ████████████████████████████ is responsible for providing Lessees with a pool of undocumented alien workers to run the gas station/convenience store. The KARIMI ORGANIZATION exercises some control over the Lessees by knowingly providing them with undocumented aliens to employ.

10.    The KARIMI ORGANIZATION is engaged in the following criminal activities surrounding the employment of undocumented alien workers at the gas station/convenience stores identified in Paragraph 5:

a)    Knowingly hiring/employing undocumented alien workers;
b)    Paying the undocumented alien employees in cash; and
c)    Failing to pay the appropriate overtime compensation, Federal and State taxes, insurances, and benefit contributions.

## CONFIDENTIAL INFORMANTS

11.    Confidential Informant 1 (hereinafter CI-1): In June 2001, CI-1 contacted the Atlanta Investigations Office for the United States Immigration and Naturalization Service[1] and identified the KARIMIs, the KARIMI ORGANIZATION and its Lessees as individuals and business entities involved in a conspiracy to knowingly hire and unlawfully employ immigrants to the United States who are not authorized to work in this country. CI-1, a Pakistani national who entered the United States illegally on or about December 5, 1990, began working for the KARIMI ORGANIZATION in 1991 at a gas station/convenience store. Later CI-1 was promoted to a position as the manager in one of the KARIMI ORGANIZATION's gas station/convenience stores. In May 1996, CI-1 was promoted a second time to the Director of Operations for the KARIMI ORGANIZATION. CI-1 worked as Director of Operations for the KARIMI ORGANIZATION until approximately November 1999, when CI-1 was terminated in connection with deportation proceedings brought against him. During the period between May, 1996, and November, 1999, CI-1 worked closely with MALIK and MANSOOR KARIMI in coordinating daily operations of the KARIMI ORGANIZATION's gas station/convenience stores, managing the KARIMI ORGANIZATION's financial operations, including accounting and payroll procedures, and managing personnel issues at each location. As a result, CI-1 became intimately familiar both with the KARIMI ORGANIZATION's records and record keeping practices and also with standard business practices utilized by the KARIMI ORGANIZATION and its Lessees. Since returning to the United States in January 2002, CI-1 has continued to work as a manager in the gas station/convenience store industry in metro Atlanta. CI-1 was paroled back into the United States for the purpose of assisting in this investigation. CI-1 has not been paid by the government for his assistance and was not provided any permanent or temporary immigration benefit from the government as a result of his cooperation in this investigation.

12.    Confidential Informant 2 (hereinafter CI-2): CI-2 is an Indian national who entered the United States on or about September 3, 1990, as a Non-Immigrant Visitor with temporary authorization to remain in the United States and no authorization to obtain employment. CI-2 began working for the KARIMI ORGANIZATION as a gas station/convenience store clerk in 1993. CI-2 was promoted to Store Manager in 1996 and left the KARIMI ORGANIZATION in December of the same year. CI-2 has not been paid by the government for his assistance and was not provided

---

[1] The Immigration and Naturalization Service became Immigration and Customs Enforcement on March 1, 2003.

any permanent or temporary immigration benefit from the government as a result of his cooperation in this investigation.

13. Confidential Informant 3 (hereinafter CI-3): CI-3 is an Indian national who entered the United States on or about December 17, 1995, as a Non-Immigrant Visitor with a temporary authorization to remain in the United States and no authorization to obtain employment. CI-3 began working in one of the KARIMI ORGANIZATION's gas station/convenience stores as a cashier in 1996. In July 1998, the KARIMI ORGANIZATION promoted CI-3 to store manager at a gas station/convenience store located at 356 Boulevard in Atlanta, Georgia. CI-3 stopped working for the KARIMI ORGANIZATION in December 2000. During this investigation, CI-3 conducted consensually monitored conversations with members of the KARIMI ORGANIZATION, representing himself as an undocumented alien attempting to obtain employment. CI-3 has not been paid by the government for his assistance and was not provided any permanent or temporary immigration benefit from the government as a result of his cooperation in this investigation. CI-3 has received compensation, an hourly wage, for undercover work related to this investigation

14. Confidential Informant 4 (hereinafter CI-4): CI-4 is an Indian national working in an undercover capacity. During this investigation, CI-4 conducted consensually monitored conversations with members of the KARIMI ORGANIZATION, posing as an undocumented alien attempting to obtain employment. CI-4 submitted an application to SHEZAD ISMAIL, the manager of a Chevron gas station located at 1105 Holcomb Bridge Road, Roswell, Georgia. This location is owned by MALIK KARIMI and leased to ISMAIL. CI-4 was hired by ISMAIL and, on June 8, 2004, CI-4 went to work as a clerk at the Chevron station On June 15, 2004, CI-4 was reassigned by MALIK KARIMI to work as an administrative assistant/bookkeeper at the KARIMI ORGANIZATION Headquarters Office, located at 1990 Lakeside Parkway, Suite 230, Tucker, Georgia 30084. CI-4 received a work permit from ICE for his assistance to law enforcement CI-4 has received compensation by the government for reasons unrelated to this investigation

15. Confidential Informant 5 (hereinafter CI-5): CI-5 is a Mexican national working in an undercover capacity, posing as an undocumented alien worker. MALIK KARIMI directly hired CI-5 and on July 27, 2004, he began working at the Chevron station located at 1105 Holcomb Bridge Road, Roswell, Georgia. This location is owned by MALIK KARIMI and leased to SHEZAD ISMAIL CI-5 received a work permit from ICE for his assistance to law enforcement. CI-5 has received compensation by the government for reasons unrelated to this investigation. Further, CI-5 has received compensation, an hourly wage, for undercover work related to this case

16. Confidential Informant 6 (hereinafter CI-1): CI-6 is a Mexican national working in an undercover capacity, posing as an undocumented alien worker MALIK KARIMI authorized the employment of CI-6 and on August 20, 2004, he began working at the Chevron station located at 1105 Holcomb Bridge Road, Roswell, Georgia. This location is owned by MALIK KARIMI and leased to SHEZAD ISMAIL. CI-4 received a work permit from ICE for his assistance to law enforcement. CI-5 has received compensation by the government for reasons unrelated to this investigation Further, CI-5 has received compensation, an hourly wage, for undercover work related to this case.

## BUSINESS PRACTICES OF THE KARIMI ORGANIZATION AND THEIR LESSEES

17. During the course of this investigation, CI-1, CI-2, CI-3, CI-4, CI-5, and CI-6 have provided personally obtained information regarding the business practices of the KARIMI

ORGANIZATION, and its Lessees. Their observations detail a conspiracy to minimize labor costs in corporate offices and gas stations/convenience store locations by illegally employing undocumented alien workers.

18. CI-1's, CI-2's, and CI-3's historical experiences as store clerks and management personnel for the KARIMI ORGANIZATION illustrate a consistent pattern in the KARIMI ORGANIZATION's personnel-related practices.

19. CI-1 reports being paid $4 25 per hour in cash upon starting work at one of the KARIMI ORGANIZATION's gas station/convenience store locations in 1991. When CI-1 was not attending college, CI-1 worked 60-80 hours per week. Later during CI-1's tenure, he reports being paid via check under a fraudulent SSN for the first 40 hours of labor and then in cash without overtime compensation for all hours worked in excess of 40 CI-1 claims that he never received overtime compensation while being employed by the KARIMI ORGANIZATION.

20 Similarly, when CI-2 began working for the KARIMI ORGANIZATION as a gas station/convenience store clerk in 1993, CI-2 was paid $5.00 per hour. At first, the KARIMI ORGANIZATION paid CI-2 on a cash-only basis. However, during the latter part of CI-2's tenure, he reports that the KARIMI ORGANIZATION paid him by check using a fraudulent SSN for the first 40 hours of labor and then in cash and without overtime compensation for all hours worked in excess of 40 From 1993 to 1996, CI-2 claims to have worked approximately 110-120 hours per week for the KARIMI ORGANIZATION and never received compensation at a rate of time and one-half for weekly labor in excess of 40 hours.

21 CI-3 began working in one of the KARIMI ORGANIZATION's gas station/convenience stores as a cashier in 1996, CI-3 was paid approximately $5.50 per hour and worked an average of 65 hours per week. CI-3 reports being paid by the KARIMI ORGANIZATION under a fraudulent SSN for the first 40 hours of labor and then in cash for all labor in excess of 40 hours. CI-3 claims that he never received compensation at a rate of time and one-half for weekly labor in excess of 40 hours while being employed by the KARIMI ORGANIZATION. CI-3 also reports working with several foreign nationals at gas station/convenience store locations under the KARIMI ORGANIZATION's control, who were not authorized to work in the United States between 1996 and 1998

22 CI-1's and CI-3's experiences as store managers with the KARIMI ORGANIZATION supply further evidence of the KARIMI ORGANIZATION's business practices.

23 During CI-1's employment with the KARIMI ORGANIZATION, both as a convenience store clerk and a manager, CI-1 reports that cash payment for overtime hours was the typical manner in which the KARIMI ORGANIZATION paid undocumented alien workers. According to CI-1, the KARIMI ORGANIZATION concealed cash payments made to its undocumented employees in numerous ways, including through the inflation and fabrication of vendor invoices.

24. According to CI-3, after being promoted to manager of the gas station/convenience store located at 356 Boulevard in Atlanta, Georgia in July 1998, CI-3 recalls paying several undocumented alien workers both in cash and by check under fraudulent SSNs for the first 40 hours worked. These employees were compensated in cash for all hours subsequent to 40 and never compensated at a rate of time and one-half for weekly labor in excess of 40 hours. CI-3 conducted this business practice at the instruction of MANSOOR and MALIK KARIMI

25.    CI-1 and CI-3 had additional experiences that strongly suggest intent by KARIMI
       ORGANIZATION principals to conceal the organization's practice of hiring and employing
       undocumented workers.

26     For example, in approximately February 1996, CI-1 reports witnessing MALIK KARIMI
       interview and hire RITU RAO. During the interview, RAO explained her immigration status by
       saying that she was the "wife of a foreign student" and indicated that the Immigration and
       Naturalization Service had not authorized her to obtain employment.
       CI-1 heard MALIK KARIMI respond to this admission by concluding that he would pay RITU
       RAO in cash. MALIK KARIMI hired RITU RAO as a secretary for SUGAR BEAR, INC. CI-1
       claims that from 1996 to 1999, he and MALIK KARIMI educated RITU RAO in the details of
       the KARIMI ORGANIZATION operations and steadily increased her involvement in the
       financial and operational aspects of that business. As a result, when CI-1 was administratively
       deported in November 1999, RITU RAO was able to take over CI-1's position as Director of
       Operations

27     Similarly, according to CI-3, in the latter part of 1999, MALIK KARIMI entered the business
       that CI-3 was managing at 356 Boulevard in Atlanta, told CI-3 that the KARIMI
       ORGANIZATION was under investigation and directed CI-3 and three other undocumented
       alien workers to go home. KARIMI further instructed CI-3 not to permit the other undocumented
       alien workers to come into the store for a few days. CI-3 reported that during the same
       interaction, MALIK KARIMI instructed CI-3 to arrive early at the store to complete store
       paperwork but directed him to refrain from actively participating in the store operation for
       approximately seven days. CI-3 stopped working for the KARIMI ORGANIZATION in
       December 2000.

28.    During CI-1's tenure as Director of Operations for the KARIMI ORGANIZATION from May
       1996 to November 1999, CI-1 estimates that, the KARIMI ORGANIZATION employed
  -    approximately 150 illegal aliens. CI-1 specifies that the KARIMI ORGANIZATION employed
       between 50-75 illegal aliens on any specific date at the 20-25 gas station/convenience stores
       locations that the KARIMI ORGANIZATION owned in the Atlanta area during this period. CI-
       1 confirms that MALIK and MANSOOR KARIMI were directly involved in hiring many of the
       undocumented alien workers, and therefore knew these employees were not authorized to work
       in the United States

29.    Although the KARIMI ORGANIZATION presently owns approximately 13 gas station/
       convenience store locations in the Atlanta area, its principals do not generally participate in day-
       to-day retail operations. The KARIMI ORGANIZATION's Lessees operate the business
       locations.

30.    According to CI-1, although Lessees have direct responsibility for operations at the stores and
       gas stations and for personnel employed at those locations, the KARIMI ORGANIZATION
       principals play two roles in providing their Lessees with a pool of undocumented alien workers.
       First, Lessees assuming leases at existing stores inherit a legacy pool of employees that includes
       undocumented alien workers. Second, principals of the KARIMI ORGANIZATION ensure that
       the organization's Lessees continue to employ undocumented workers by knowingly referring
       undocumented alien workers for employment

31     This process of knowingly referring undocumented alien workers to Lessees and other associates
       is well illustrated by the following interactions between the KARIMIS, the Lessees and various
       confidential informants

32.    On February 20, 2004, CI-3 participated in a consensually monitored conversation with MALIK
       KARIMI at the direction of ICE-Atlanta. During this conversation, CI-3 claimed to be unable to
       find a job because of his illegal status. MALIK KARIMI acknowledged
       CI-3's illegal status and promised to attempt to find him a job. During the conversation,
       MALIK KARIMI made the unsolicited statement that 'things had changed' since CI-3 was last
       employed by the KARIMI ORGANIZATION. MALIK KARIMI further commented that the
       organization could no longer employ illegal aliens as easily as it once had and acknowledged that
       'you could not just pay them in cash and let them work up front anymore.'

33.    Two days later, on February 25, 2004, CI-2 participated in a consensually monitored
       conversation at ICE-Atlanta's direction, this time with MANSOOR KARIMI. During this
       conversation, CI-2 claimed to have an acquaintance who had been unable to secure a job because
       of the acquaintance's status as an illegal immigrant. MANSOOR KARIMI instructed CI-2 to
       supply the acquaintance's resume and promised to attempt to find the acquaintance a job.

34     On June 5, 2004, CI-4 posed as an undocumented alien seeking employment and conducted a
       consensually monitored conversation with SHEZAD ISMAIL, manager of a Chevron Station
       located at 1105 Holcomb Bridge Road. CI-4 gave ISMAIL a resume and stated immediately that
       he did not have status to work in the United States lawfully, but was willing to do anything and
       work any shift  ISMAIL replied that he would have to pay him cash, since he did not have any
       documents. He also warned CI-4 that he would claim not to know CI-4 'if anyone finds out '
       CI-4 also asked him who ran the store, and ISMAIL stated that he had just taken over control of
       the Chevron from VISHWANATH RAO.  ISMAIL agreed to start CI-4 at $7 per hour in cash,
       seven days each week.  On June 8, 2004, CI-4 began work at the Holcomb Bridge Road Chevron
       station

35.    On June 11, 2004, MALIK KARIMI contacted███regarding his resume.  KARIMI stated that
       ISMAIL had sent a copy of his resume and he was impressed by his work experience and
       education.  KARIMI stated he would like to employ ███ in the KARIMI ORGANIZATION's
       Headquarters Office as an administrative assistant and bookkeeper during the week, while still
       working him at the Chevron station at night  The following day, KARIMI met with ISMAIL at
       the Chevron station, where he heard KARIMI tell ISMAIL that he intended to have ███ locate
       other undocumented aliens to work in his stations, as he is able to pay them lower wages

36.    On June 13, 2004, CI-4 conducted a consensually monitored conversation with MALIK KARIMI
       at the Cheesecake Factory in Atlanta, Georgia  KARIMI requested the meeting with CI-4 to
       further discuss his employment opportunities with the KARIMI ORGANIZATION.  KARIMI
       stated that, in general, he intended to reduce the number of employees working in his gas stations
       and increase the number of shift hours.  KARIMI mentioned that he would be amenable to
       compensating CI-4 in the form of rent payments to his landlord, thereby reducing tax liability for
       both CI-4 and the KARIMI ORGANIZATION.  KARIMI concluded this conversation stating he
       would like CI-4 to begin working in his office the following week.  On June 15, 2004, CI-4
       began work at the KARIMI ORGANIZATION Headquarters Office located at 1990 Lakeside
       Parkway, Suite 230, Tucker, Georgia. KARIMI agreed to compensate CI-4 at $8 per hour in
       cash  Wage payments to CI-4 for his hours at both the gas station/convenience store and at the
       Headquarters office are made by SHEZAD ISMAIL.  CI-4 has never been compensated at a rate
       of time and one-half for weekly labor in excess of 40 hours.  All cash payments made to CI-4 by
       SHEZAD ISMAIL were documented as evidence.

37     On or about July 26, 2004. MALIK KARIMI contacted CI-5 regarding a job.  CI-4 had provided
       KARIMI with CI-5's contact information pursuant to KARIMI's request that

CI-4 locate 'intelligent undocumented aliens like himself' to work in KARIMI ORGANIZATION gas stations  At the conclusion of the call, KARIMI informed CI-5 that he was hired and instructed him to report to the Chevron located at 1105 Holcomb Bridge Road, Roswell, Georgia. KARIMI hired CI-5 at $6 per hour. On July 27, 2004, CI-5 began work at the Holcomb Bridge Road Chevron Station. CI-5 has never been compensated at a rate of time and one-half for weekly labor in excess of 40 hours. All cash payments made to CI-5 by SHEZAD ISMAIL were documented as evidence.

38.   On or about August 16, 2004, MALIK KARIMI directed CI-4 to contact CI-6 regarding a job. CI-4 had provided KARIMI with CI-6's contact information pursuant to KARIMI's request that CI-4 locate 'intelligent undocumented aliens like himself' to work in KARIMI ORGANIZATION gas stations. CI-4 instructed CI-6 to call SHEZAD ISMAIL, the manager of the Chevron station at 1105 Holcomb Bridge Road. When CI-6 called ISMAIL, he conducted a brief interview and at the conclusion of the call, ISMAIL informed CI-6 that he was hired. ISMAIL instructed CI-6 to report to the Chevron located at 1105 Holcomb Bridge Road, Roswell, Georgia  KARIMI hired CI-6 at $6 per hour. On August 20, 2004, CI-6 began work at the Holcomb Bridge Road Chevron Station. CI-6 has never been compensated at a rate of time and one-half for weekly labor in excess of 40 hours. All cash payments made to CI-6 by SHEZAD ISMAIL were documented as evidence.

### PROBABLE CAUSE TO SEARCH GAS STATION/CONVENIENCE STORES

39.   Between October 8 and 30, 2003, at the direction of ICE-Atlanta, CI-1 observed and identified various individuals working at KARIMI ORGANIZATION gas stations/convenience store that CI-1 recognized as workers illegally employed by the KARIMI ORGANIZATION and its Lessees during CI-1's tenure with the KARIMI ORGANIZATION. The locations where CI-1 observed these individuals and the numbers of individuals that CI-1 observed at each location are reflected in the spreadsheet attached hereto as Attachment A.

40.   Between March 14 and March 27, 2004, agents from ICE-Atlanta, USDOL and USPIS conducted surveillance at gas station and convenience store locations owned by the KARIMI ORGANIZATION and its Lessees in the Atlanta area. During this period, agents observed each location three times each day for 13 consecutive days. The number of different employees the agents observed working at each location during this period is reflected in the spreadsheet attached hereto as Attachment A.

41.   Based on my training and experience, I know that reports submitted to government agencies by employers can be a valuable source of information about employment practices. During this investigation, I reviewed many such reports submitted by the defendant corporations.  Two common practices were evident among businesses illegally employing undocumented workers  First, such businesses omit references to their undocumented alien workers when making their reports  Alternatively, such businesses report wages paid to undocumented workers using fraudulent SSNs

42.   Pursuant to O C.G.A §§ 34-8-121 and 34-8-165, each employer in Georgia must complete and file a Quarterly Tax and Wage Report, also known as a Form DOL-4, with the Georgia Department of Labor. That form lists the name, SSN, wages paid, and taxes due as to each person employed by a particular business during the applicable quarter.

43.   In connection with this investigation, I have obtained and reviewed database summaries of the Forms DOL-4 that the KARIMI ORGANIZATION and its Lessees, have filed with the Georgia

Department of Labor for the first quarter of 2004. The number of employees reported by each business entity during that period is reflected in the spreadsheet attached hereto as Attachment A.

44.     A comparison of the information contained in these Forms DOL-4 for the first quarter of 2004 to agents' observations of the number of individuals working at each location between March 14 and March 27, 2004, revealed that the KARIMI ORGANIZATION and its Lessees uniformly reported paying wages to significantly fewer employees than were observed during the surveillance. Further, an examination of the SSNs supplied on the Forms DOL-4 by the KARIMI ORGANIZATION and its Lessees revealed a significant number of fraudulent SSNs reported.

45      Between May 27 and May 28, 2004, I personally interviewed employees at various gas station/convenience store locations connected to the KARIMI ORGANIZATION and its Lessees. During these interviews, I identified all of the employees at the location and asked each to supply his or her biographical information, including place of birth. Using this information, a subsequent query of ICE databases[2] revealed that many of the employees working in KARIMI ORGANIZATION gas station/convenience store sites were not authorized to reside or work in the United States. The number of employees reporting foreign birthplaces at each location and the number of employees absent from ICE databases is reflected in the spreadsheet attached hereto as Attachment A.

46.     During the employment tenures of CI-1, CI-2, CI-3, CI-4, CI-5, and CI-6 with the KARIMI ORGANIZATION and its Lessees, all CIs report observing the common practice of maintaining employee and accounting records relevant to the management of employees in individual store locations.

47.     Based on the foregoing, probable cause exists to believe that the gas station/convenience store locations listed in Paragraph 5 contain evidence establishing that the targets of this investigation are involved in a conspiracy to encourage and induce certain aliens to remain in the United States, knowingly hire unauthorized aliens and continue the knowing employment of unauthorized aliens  Consequently, I respectfully request that the Court issue a search warrant for these locations.

48      Gas Station/Convenience Store Locations

49.     Shell, 1338 Virginia Avenue, College Park, Georgia  30344,  as described more fully in Attachment A, row 1, case agents and confidential informants conducted multiple surveillance operations to confirm the presence of undocumented alien workers employed at this location.

50.     Chevron, 580 McDonough Boulevard, Atlanta, Georgia  30315, as described more fully in Attachment A, row 2, case agents and confidential informants conducted multiple surveillance operations to confirm the presence of undocumented alien workers employed at this location.

51.     Amoco, 575 Chappel Road, Atlanta, Georgia  30318, as described more fully in Attachment A, row 3, case agents and confidential informants conducted multiple surveillance operations to confirm the presence of undocumented alien workers employed at this location

---

[2] ICE databases, which include the Central Index System (CIS) and the Non Immigrant Information System (NIIS), should contain records of all persons of foreign birth authorized to visit, reside or work in the United States

52    Amoco, 356 Boulevard NE, Atlanta, Georgia 30312, as described more fully in Attachment A,
       row 4, case agents and confidential informants conducted multiple surveillance operations to
       confirm the presence of undocumented alien workers employed at this location.

53.   Amoco, 350 Moreland Avenue, NE, Atlanta, Georgia 30307, as described more fully in
       Attachment A, row 5, case agents and confidential informants conducted multiple surveillance
       operations to confirm the presence of undocumented alien workers employed at this location

54.   Amoco, 1111 Moreland Avenue, SE, Atlanta, Georgia  30316, as described more fully in
       Attachment A, row 6, case agents and confidential informants conducted multiple surveillance
       operations to confirm the presence of undocumented alien workers employed at this location

55.   Chevron, 2331 Peachtree Road, Atlanta, Georgia  30305, as described more fully in Attachment
       A, row 7, case agents and confidential informants conducted multiple surveillance operations to
       confirm the presence of undocumented alien workers employed at this location.

56.   Amoco, 2964 Moreland Avenue, SE, Conley, Georgia  30288, as described more fully in
       Attachment A, row 8, case agents and confidential informants conducted multiple surveillance
       operations to confirm the presence of undocumented alien workers employed at this location

57    Amoco, 4556 E. Ponce De Leon Avenue, Decatur,  Georgia 30030, as described more fully in
       Attachment A, row 9, case agents and confidential informants conducted multiple surveillance
       operations to confirm the presence of undocumented alien workers employed at this location

58.   Amoco, 475 Windy Hill Road, Marietta, Georgia  30060, as described more fully in Attachment
       A, row 10, case agents and confidential informants conducted multiple surveillance operations to
       confirm the presence of undocumented alien workers employed at this location.

59    Chevron, 1105 Holcomb Bridge Road, Roswell, Georgia  30076, as described more fully in
       Attachment A, row 11 and 12, case agents and confidential informants conducted multiple
       surveillance operations to confirm the presence of undocumented alien workers employed at this
       location.

60.   Amoco, 5625 Buford Highway, Doraville, Georgia  30340, as described more fully in
       Attachment A, row 13, case agents and confidential informants conducted multiple surveillance
       operations to confirm the presence of undocumented alien workers employed at this location

61.   Exxon, 486 E. Ponce De Leon Avenue, Atlanta, Georgia  30308, as described more fully in
       Attachment A, row 14, case agents and confidential informants conducted multiple surveillance
       operations to confirm the presence of undocumented alien workers employed at this location.

## PROBABLE CAUSE TO SEARCH HEADQUARTERS LOCATIONS

62.   1990 Lakeside Parkway, Suite 230, Tucker, Georgia

63.   Georgia Secretary of State lists 1990 Lakeside Parkway, Suite 230, Tucker, Georgia as the
       address for SUGAR BEAR, INC, HENRICO MK LLC, CENTURY MK LLC, SYNERGY
       PETROLEUM MK LLC, and BOULEVARD C-STORE, INC.

64    CI-4 has worked at this location for the KARIMI ORGANIZATION since June 15, 2004. Since
       approximately June 15, 2004, CI-4 has observed ROZINA JIVAN and Nasim ROY, both
       undocumented alien workers, working for the KARIMI ORGANIZATION  Additionally, CI-4

11

reports observing various business records relating to the operation of the gas station/ convenience stores and specifically the employment of foreign nationals. These records are maintained in a large file room in the office suite, as well as in digitial format on the offices Local Area Network (LAN) at this location.

65    Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for this business are being mailed to this location.

66.   4315 Camellia Ridge Way, Lilburn, Georgia

67.   Georgia Secretary of State lists 4315 Camelia Ridge Way in Lilburn, Georgia, the residential address for AMANULLAH DEVJI and RAFIQ DEVJI, as the corporate address for AAAIR, INC.

68.   Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for STATION SERVICES, LLC, AAAIR, INC. and SHOP SERVICES, INC are being mailed to this location.

69.   2590 Windwood Court, Atlanta, Georgia

70    Georgia Secretary of State lists 2590 Windwood Court in Atlanta, Georgia, the residential address for RITU RAO and VISHWANATH RAO, as the address for DARVEE BUSINESS SERVICES, LLC.

71    Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for this business are being mailed to this location.

72.   4555 Bradstone Trace NW, Lilburn, Georgia

73.   Georgia Secretary of State lists 4555 Bradstone Trace NW, Lilburn, Georgia, the residence of NAWZ SHARIF, as the address for OVERSEAS ENTERPRISES, INC.

74.   Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for OVERSEAS ENTERPRISES, INC and INTRADECO, INC are being mailed to this location.

75.   4508 Lyngate Drive SW, Lilburn, Georgia  30047

76    Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for CONTINENTAL CRAFT USA, INC. are mailed to this location

77.   3104 C Jemson Place, Lawrenceville, Georgia 30043

78.   Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for MALLS, LLC are being mailed to this location.

79.   3408 Chamblee Tucker Road, Chamblee, Georgia  30341

80.   Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for STATION SERVICES, INC. are being mailed to this location.

81.   4070 Bradstone Trace NW, Lilburn, Georgia  30047

82.   Evidence obtained through standard investigative methods employed by USPIS reveal that financial/corporate records for FFBE, LLC a/k/a FEBE, LLC are being mailed to this location.

83.   Georgia Department of Labor lists 4070 Bradstone Trace NW, Lilburn, Georgia, the residence of SYED HOSSAIN, as the business address of FFBE, LLC a/k/a FEBE LLC

## PROBABLE CAUSE TO SEARCH PUBLIC STORAGE FACILITIES

84.   The Public Storage Facility, Unit C-120, located at 3400 Lawrenceville Highway, Tucker, Georgia is a one-story, commercial rental storage unit facility located northeast of the intersection of Lawrenceville Highway and Northlake Parkway.   On May 5, 2004, ROZINA JIVAN, an office worker employed by SUGAR BEAR, INC., told CI-1 that the KARIMI ORGANIZATION stored its historical business records at this Public Storage rental location Additionally, on October 21, 2004, CI-4 went to the Public Storage management office located on Lawrenceville Highway, a location where he had been sent by the KARIMI ORGANIZATION on several occasions to pay the rental fee for their storage units, and obtained a receipt detailing the KARIMI ORGANIZATION's payment history for two storage units (#C-120 and #J-89) and confirming that both were still in use

85.   

## ASSETS SUBJECT TO SEIZURE

86.   Using undocumented alien employees to run their businesses gives the KARIMI ORGANIZATION, and the Lessees an unfair advantage against their competitors by reducing labor costs significantly.   Specifically, according to USDOL labor cost analysis and CI information, the KARIMI ORGANIZATION and its co-conspirators achieve significant savings by refusing to pay overtime compensation and failing to pay the employer's share of applicable state and federal taxes, insurance and benefit contributions.   As a result, the KARIMI ORGANIZATION and its co-conspirators realize labor cost savings as high as $8,000 per employee per year since 1996

87   **Places to be Searched**:  This affidavit is made in support applications by the United States of America seeking a warrant to search the following locations for evidence, fruits and instrumentalities of criminal violations of Title 8, United States Code, Section §§ 1324 and 1324a, as more fully set forth below

88   Gas Station/Convenience Store Locations

89   Shell, 1338 Virginia Avenue, College Park, Georgia  30344, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located immediately at the top of the Virginia Avenue exit ramp from I-85 south,

13

90.  Chevron, 580 McDonough Boulevard, Atlanta, Georgia 30315, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located at the intersection of McDonough Boulevard SE and Boulevard SE;

91  Amoco, 575 Chappel Road, Atlanta, Georgia 30318, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located at the intersection of Chappel Road and Donald Lee Hollowell Road,

92  Amoco, 356 Boulevard NE, Atlanta, Georgia 30312, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located at the intersection of Boulevard NE and Ralph McGill Boulevard,

93.  Amoco, 350 Moreland Avenue, NE, Atlanta, Georgia 30307, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located less than one block south of the intersection of Moreland Avenue and McLendon Avenue,

94.  Amoco, 1111 Moreland Avenue, SE, Atlanta, Georgia 30316, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located at the intersection of Moreland Avenue and East Confederate Avenue;

95.  Chevron, 2331 Peachtree Road, Atlanta, Georgia 30305, more particularly described as a one-story combination convenience store and service station, located at the intersection of Peachtree Road and Peachtree Hills Avenue;

96.  Amoco, 2964 Moreland Avenue, SE, Conley, Georgia 30288, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located less than one block south of the intersection of Moreland Avenue and Henrico Road;

97.  Amoco, 4556 E Ponce De Leon Avenue, Decatur, Georgia 30030, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located at the intersection of East Ponce De Leon Avenue and Laredo Drive;

98.  Amoco, 475 Windy Hill Road, Marietta, Georgia 30060, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located less than one block west of the intersection of Windy Hill Road and South Cobb Drive;

99.  Chevron, 1105 Holcomb Bridge Road, Roswell, Georgia 30076, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located at the intersection of Holcomb Bridge Road and Old Dogwood Road;

100  Amoco, 5625 Buford Highway, Doraville, Georgia 30340, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows

14

allowing full view into the store  The site is located at the intersection of Buford Highway and Longmire Way;

101.  Exxon, 486 E. Ponce De Leon Avenue, Atlanta, Georgia 30308, more particularly described as a one-story combination convenience store and service station with a bank of plate glass windows allowing full view into the store, located at the intersection of East Ponce De Leon Avenue and Boulevard NE;

102.  Corporate/Business Headquarters Locations:

103.  1990 Lakeside Parkway, Suite 230, Tucker, Georgia 30084, more particularly described as a one-story office space located  less than one block east of the intersection of Lakeside Parkway and Northlake Parkway;

104.  2590 Windwood Court, Atlanta, Georgia 30360, more particularly described as a residential site located at the intersection of Windwood Court and Fleur de Lis Place;

105.  4555 Bradstone Trace NW, Lilburn, Georgia 30047, more particularly described as a circle located approximately 2000 feet east of the intersection of Burns Road and Beaver Ruin Road; 4555 Bradstone Trace is approximately 2000 feet west of the intersection of Bradstone Trace and Burns Road;

106.  3408 Chamblee Tucker, Chamblee, Georgia 30341, more particularly described as a one-story combination convenience store and service station. This site is located at or near the intersection of Chamblee Tucker Road and Embry Circle;

107.  3104 Clemson Place, Lawrenceville, Georgia 30043, more particularly described as a residential site located at the intersection of Clemson Place and Clemson Lane;

108.  4508 Lyngate Drive SW, Lilburn, Georgia 30047, more particularly described as a residential site located at the intersection of Lyngate Drive and Catamount Drive;

109   4070 Bradstone Trace NW, Lilburn, Georgia 30047, more particularly described as a residential site located at the intersection of Bradstone Trace and Burns Road;

110   4315 Camellia Ridge Way, Lilburn, Georgia 30047, more particularly described as a residential site located at the intersection of Camellia Ridge Way and Catamount Drive;

111.  Miscellaneous:

112.  Public Storage Facility, 3400 Lawrenceville Highway, Unit # C-120, Tucker, Georgia, 30084, more particularly described as a one-story, commercial rental storage unit facility located approximately 400 feet northeast of the intersection of Lawrenceville Highway and Northlake Parkway;

113.  Public Storage Facility, 1438 Montreal Road, Unit #J-89, Tucker GA 30084-6902, more particularly described as a one-story, commercial rental storage unit facility located northwest of the intersection of Montreal Road and Honea Road,

114.  Items to be seized at each location· See Attachment B.

## FORFEITABLE ITEMS TO BE SEIZED

115.   **Assets to be Seized**   Additionally, this affidavit is made in support of applications by the United States of America seeking warrants to seize the following assets as proceeds traceable to violations of 8 U.S.C. § 1324(a), specified unlawful activities, pursuant to 18 U.S.C § 981(a)(1)(C).

   A    Fidelity National Bank Account Number ██9514, held in the name of SUGAR BEAR INC;

   B    Fidelity National Bank Account Number ██1310 held in the name of HENRICO MK, LLC;

   C    Fidelity National Bank Account Number ██2430 held in the name of SHOPE SERVICES, INC ;

   D    BB&T Bank Account Number ██9662 held in the name of AAAIR CORP, INC ;

   E    Fidelity National Bank Account Number ██5411 held in the name of AAAIR, INC ;

   F    Main Street Bank Account Number ██0674 held in the name of MORELAND AVENUE D/B/A SHOP SERVICES, INC ;

   G    Main Street Bank Account Number ██3177 held in the name of AAAIR INC D/B/A AMOCO FOOD SHOP,

   H    Fidelity National Bank Account Number ██3950 held in the name of J.F R. LLC,

   I    Wachovia Bank Account Number ██1997 held in the name of INTRADECO, INC ,

   J    Bank of America Account Number ██2230 held in the name of CONTINENTAL CRAFT USA, INC.;

   K.   Fidelity National Bank Account Number ██5325 held in the name of FFBE LLC.

   L    Fidelity National Bank Account Number ██7327 held in the name of J.F.R LLC,

   M    Main Street Bank Account Number ██3604 held in the name of KHM, INC. D/B/A AMOCO CLARKSTON,

   N    Wachovia Bank Account Number ██4082 held in the name of OVERSEAS ENTERPRISES INC.,

O.   Fidelity National Bank Account Number ⬛8328 held in the name of J.F.R. LLC D/B/A CHEVRON FOOD MART;

P    Wachovia Bank Account Number ⬛0499 held in the name of OVERSEAS ENTERPRISES INC.;

Q.   Fidelity National Bank Account Number ⬛4071 held in the name of J.F.R., LLC,

R.   Fidelity National Bank Account Number ⬛9208 held in the name of MALLS, LLC;

S    Main Street Bank Account Number ⬛8612 held in the name of KHM, INC. DBA AMOCO FOOD MART,

T.   Bank of America Bank Account Number ⬛2604 held in the name of MALLS, LLC,

U.   Fidelity National Bank Account Number ⬛2018 held in the name of Rafiq DEVJI;

V.   New York Life policy number ⬛6147;

W    New York Life policy number ⬛0076;

X.   SouthTrust Bank Account Number ⬛0312 held in the name of Shezad ISMAIL,

Y    Fidelity National Bank Account Number ⬛1904 held in the name of CHAPPELL MK, LLC,

Z    Fidelity National Bank Account Number ⬛9459 held in the name of BOULEVARD C STORES INC;

AA   Fidelity National Bank Account Number ⬛8570 held in the name of APEX MK, LLC;

BB   Fidelity National Bank Account Number ⬛6040 held in the name Century MK, LLC.,

CC.  Fidelity National Bank Account Number ⬛8581 held in the name of SYNERGY PETROLEUM LLC.;

DD   Fidelity National Bank Account Number ⬛0010 held in the name of MANSOORALI KARIMI and Noorjehan M KARIMI,

EE.  Fidelity National Bank Account Number ⬛4838 held in the name of MALIK

KARIMI and Shela KARIMI.;

FF.   New York Life Insurance policy number ████8780;

GG.   New York Life Insurance policy number ████8796;

HH.   Trustmark National Bank Account Number ████6301 held in the name of DELTA MK, LLC D/B/A DELTA TRAVEL CENTER;

II.   Fidelity National Bank Account Number ██2905 held in the name of SUGAR BEAR, INC;

JJ.   Fidelity National Bank Account Number ██837 held in the name of SUGAR BEAR INC;

KK.   Wachovia Bank Account number ██████5747 held in the name of MALIK KARIMI and Shela KARIMI;

LL.   Smith Barney Account 410-26557;

MM.   Wachovia Bank Account Number ██████3634, held in the name of MANSOOR KARIMI,

NN.   Smith Barney Account Number ████6563;

OO   SunTrust Bank Account Number ████9023 held in the name of VISHWANATH RAO and Ritu RAO,

PP.   SouthTrust Bank Account Number ████4522 held in the name of MANSOORALI KARIMI and Noorjehan M. KARIMI;

QQ   SunTrust Account Number ████9132 held in the name of VISHWANATH RAO and RITU RAO,

116.   As with other successful commercial operations, the KARIMI ORGANIZATION and its Lessees operate its businesses, generate gross revenues, deposit those gross revenues into operating accounts, and use at least a portion of the gross revenues to satisfy operating expenses   The KARIMI ORGANIZATION and the Lessees utilize undocumented alien employees to staff its businesses, thereby significantly reducing its labor-related operating expenses.   The KARIMI ORGANIZATION and its Lessees achieve its savings by failing to pay overtime compensation to undocumented workers who work more than forty hours per week, and, where employees are paid solely in cash, by failing to withhold applicable state and federal taxes and by failing to make appropriate and applicable insurance and benefit contributions

18

117.   By examining information supplied by Confidential Informants, information obtained
during the course of the investigation, and statistics available from the Bureau of Labor
Statistics, USDOL Special Agent McGlamery has estimated the labor costs savings that
the KARIMI ORGANIZATION and its Lessees have achieved by employing
undocumented workers.  The analysis shows that KARIMI ORGANIZATION and
Lessee employees typically work approximately 65 hours per week and presently earn
approximately $8.00 per hour for both regular time and overtime work.  Bureau of Labor
Statistics figures show that between 1996 and 2003, employers of private industry
workers in the retail trade were lawfully required to pay overtime compensation at a rate
of time and one-half, pay employer-share taxes and supply benefits in addition to wages
paid to employees, costs that the KARIMI ORGANIZATION and its Lessees did not
incur insofar as they paid their undocumented alien workers in cash and/or failed to
adequately compensate them for overtime.  These required benefits and taxes cost the
employer an amount that averages 10.15% of each employee's pay.  Consequently, the
non-payment of adequate overtime compensation and required taxes and benefits allows
the KARIMI ORGANIZATION and its Lessees to save approximately $120.30 per week
per employee, i.e., approximately $6,255.60 per employee per 52 week year, for
undocumented workers paid under fraudulent social security numbers for their first 40
hours of work and then in cash for an average of 25 hours of overtime pay.  Similarly, for
undocumented workers paid entirely in cash who work an additional 25 hours of
overtime, the KARIMI ORGANIZATION and its Lessees generally save approximately
$152.78 per weekly per employee, i.e., approximately $7,944.56 per employee per 52-
week year.  Based on figures showing that the KARIMI ORGANIZATION and its
Lessees employed a total of approximately 21 workers using fraudulent social security
numbers and approximately 53 additional unreported workers during 1st Quarter 2004,
the KARIMI ORGANIZATION and its Lessees saved an estimated $552,000 during the
last twelve months alone by illegally employing undocumented workers.  The KARIMI
ORGANIZATION and its Lessees achieved savings between 1996-2003 that are
calculable in a similar manner.

118.   By examining financial records obtained during the course of this investigation, the
Immigration and Customs Enforcement Asset Identification and Removal Group was
able to identify Lessees' bank accounts, KARIMI ORGANIZATION corporate bank
accounts, personal bank accounts, insurance policies, and brokerage accounts associated
with the KARIMI ORGANIZATION and its Lessees.  Record analysis revealed that
between January 2001 and June 2004, Lessees transferred tainted funds from business
operating accounts to Fidelity National Bank Account Number ▆9514, held in the
name of SUGAR BEAR INC (hereinafter the 9514 account) and Fidelity National Bank
Account Number ▆1310 held in the name of HENRICO MK, LLC (hereinafter the
1310 account) for rent due on business locations, fuel, loans, and other business-related
expenses.  Also, review of the financial records showed that in or after January 2001,
funds drawn from the 9514 account were transferred into business accounts belonging to
other KARIMI ORGANIZATION corporations  for rent and other business related
expenses, into a SUGAR BEAR Payroll Account to pay wages; and into the KARIMI'S
personal bank accounts for bonuses   The analysis further revealed that the criminal

organization members then used monies from their personal accounts or from their business accounts to purchase life insurance policies and to fund brokerage accounts for themselves and/or their family members. Records also indicated that tainted funds drawn on the 1310 account were transferred into a KARIMI ORGANIZATION corporate account, which in turn transferred funds into Fidelity National Bank Account Number ████2905 held in the name of SUGAR BEAR, INC (hereinafter the Savings Account). The KARIMI ORGANIZATION transferred funds from the 1310 account into life insurance policies for themselves In addition, records showed that Lessees transferred funds from their business operating accounts into personal accounts as wages, and that afterward funds from the personal accounts were used to buy life insurance policies. Attachment C is a diagram that describes the flow of funds from account to account and the dates when each account became tainted.

## THE LESSEE OPERATING ACCOUNTS

119. The investigation has shown that the following accounts are Lessee business or operating accounts into which funds constituting proceeds traceable to illegal alien labor are held and/or from which business operating expenses are paid from gross revenues of the applicable businesses:

a   Fidelity National Bank Account Number ███2430 held in the name of SHOPE SERVICES, INC , a business associated with RAFIQ DEVJI,

b.  BB&T Bank Account Number███9662 held in the name of AAAIR CORP, INC a business associated with AMANULLAH DEVJI;

c   Fidelity National Bank Account Number███5411 held in the name of AAAIR, INC., a business associated with AMANULLAH DEVJI,

d.  Main Street Bank Account Number███0674 held in the name of MORELAND AVENUE d/b/a SHOP SERVICES, INC., a business associated with RAFIQ DEVJI,

e   Main Street Bank Account Number███3177 held in the name of AAAIR INC d/b/a AMOCO FOOD SHOP, a business associated with AMANULLAH DEVJI and RAFIQ DEVJI,

f   Fidelity National Bank Account Number███8950 held in the name of J F.R , LLC, a business associated with LONY ASHAN and NAZMUL ASHAN;

g   Wachovia Bank Account Number███1997 held in the name of INTRADECO, INC., a business associated with SAMAD SHAIKH;

h   Bank of America Account Number███2230 held in the name of CONTINENTAL CRAFT USA, INC a business associated with ABDUL HAMID;

i   Fidelity National Bank Account Number███5325 held in the name of FFBE, LLC, a business associated with SYED HOSSAIN,

j   Fidelity National Bank Account Number███7327 held in the name of J.F R , LLC, a business associated with LONY ASHAN and NAZMUL AHSAN;

k.    Main Street Bank Account Number████3604 held in the name of KHM. INC. d/b/a AMOCO CLARKSTON, a business associated with HABIBULLAH HEMANI;

l.    Wachovia Bank Account Number ████4082 held in the name of OVERSEAS ENTERPRISES, INC., a business associated with NAWZ SHARIF;

m.    Fidelity National Bank Account Number ███8328 held in the name of J F.R., LLC d/b/a CHEVRON FOOD MART, a business associated with LONY ASHAN and NAZMUL ASHAN;

n.    Wachovia Bank Account Number ██████0499 held in the name of OVERSEAS ENTERPRISES, INC., a business associated with NAWZ SHARIF

o.    Fidelity National Bank Account Number███4071 held in the name of J.F.R , LLC, a business associated with LONY AHSAN and NAZMUL ASHAN,

p    Fidelity National Bank Account Number███9208 held in the name of MALLS, LLC, a business associated with SHEZAD ISMAIL;

q.    Main Street Bank Account Number ███3612 held in the name of KHM, INC d/b/a AMOCO FOOD MART, a business associated with HABIBULLAH HEMANI.

r    Bank of America Bank Account Number██████2604 held in the name of MALLS, LLC, a business associated with SHEZAD ISMAIL.

## TRANSFERS FROM LESSEE OPERATING ACCOUNTS TO LESSEE CHECKING ACCOUNTS

120.    Using tainted funds drawn from Lessees' business or operating accounts. the companies transferred payments to personal checking accounts. A review of the bank records shows the payments and transfers during the specified time periods from the following accounts, which are tainted by proceeds of employing illegal alien laborers:

a.    Between January 9, 2003 and April 4, 2004, a total of approximately $44,291.96 was transferred from Main Street Bank Account Number ███0674 held in the name of MORELAND AVENUE d/b/a SHOP SERVICES into Fidelity National Bank Account Number ███2018 (hereinafter the 2018 account) held in the name of Rafiq DEVJI. Funds from Main Street Bank Account Number ███0674 were subsequently transferred funds into two New York Life Insurance policies On September 11, 2003, a total of $100 was transferred into New York Life policy number███5147 from the 2018 account On March 1, 2004, a total of $272.50 was transferred into New York Life policy number███0076 from the 2018 account.

b.    On August 17, 2004, a total of approximately $220 was transferred from Fidelity National Bank Account Number███9208 held in the name of MALLS, LLC into SouthTrust Bank Account Number███0312 held in the name of SHEZAD ISMAIL.

## TRANSFERS FROM LESSEE ACCOUNTS TO SUGAR BEAR, INC ACCOUNT NUMBER 6009514, THE 9514 ACCOUNT

121. Using tainted funds drawn from the Lessee business and operating accounts listed in paragraph 119, during the following periods, Lessees have transferred the following payments for various charges, including rents due on business locations, loans, fuel and other store-related expenses, into the KARIMI ORGANIZATION's 9514 account:

    a. Between January 10, 2001, and August 22, 2001, a total of approximately $75,278 31 transferred from tainted Fidelity National Bank Account Number ⬛2430 held in the name of SHOPE SERVICE, INC.;

    b Between February 8, 2001, and March 15, 2001, a total of approximately $18,000 transferred from tainted BB&T Bank Account Number⬛9662 held in the name of AAAIR, INC.;

    c Between April 11, 2001, and August 22, 2001, a total of approximately $30,000 transferred from tainted Fidelity National Bank Account Number⬛5411 held in the name of AAAIR, INC ;

    d Between March 2004, and June 2004, a total of approximately $320,295 68 transferred from tainted Main Street Bank Account Number⬛0674 and held in the name of MORELAND AVENUE d/b/a SHOP SERVICES, INC ;

    e. Between March 2004, and June 2004, a total of approximately $161,716 85 transferred from tainted Main Street Bank Account Number⬛3177 held in the name of AAAIR, INC. d/b/a Amoco Food Shop;

    f Between March 2004, and June 2004, a total of approximately $362,243.47 transferred from tainted Fidelity National Bank Account Number⬛3950 held in the name of J.F.R., LLC;

    g Between April 2004, and June 2004, a total of approximately $250,820.92 transferred from tainted Wachovia Bank Account Number⬛1997 held in the name of INTRADECO, INC ,

    h Between April 2004, and June 2004, a total of approximately $94,530 transferred from tainted Bank of America Account Number⬛2230 held in the name of CONTINENTAL CRAFT USA, INC , and

    i Between April 2004, and June 2004, a total of approximately $205,097.49 transferred from tainted Fidelity National Bank Account Number⬛5325 held in the name of FFBE, LLC.

## TRANSFERS FROM THE 9514 ACCOUNT TO OTHER ACCOUNTS

122. After the Lessee payments tainted the 9514 account, between February 2001 and April 2004, funds were transferred from the 9514 account directly into nine bank accounts controlled by the KARIMI ORGANIZATION as specified below:

    a Between May 1, 2001, and April 8, 2004, a total of approximately $335,000 transferred from the 9514 account to Fidelity National Bank Account Number ⬛1904 held in the name of CHAPPELL MK, LLC,

    b. Between January 27, 2003, and March 1, 2004, a total of approximately $76,658.82 transferred from the 9514 account into Fidelity National Bank Account Number⬛9459 held in the name of BOULEVARD C STORES INC ,

    c Between October 9, 2003, and April 8, 2004, a total of approximately $110,000

transferred from the 9514 account into Fidelity National Bank Account Number █8570 held in the name of APEX MK, LLC.;

d. Between October 9, 2003, and April 8, 2004, a total of approximately $149,350 transferred from the 9514 account into Fidelity National Bank Account Number █6040 held in the name Century MK,LLC;

e. Between November 1, 2003, and April 8, 2004, a total of approximately $108,000 transferred from the 9514 account into Fidelity National Bank Account Number █8581 held in the name of SYNERGY PETROLEUM LLC,

f. On December 30, 2002, a total of approximately $165,000 transferred from the 9514 account into Fidelity National Bank Account Number █0010 held in the name of MANSOORALI KARIMI and Noorjehan M. KARIMI

g. On December 30, 2002, a total of approximately $165,000 transferred from the 9514 account into Fidelity National Bank Account Number █4838 held in the name of MALIK KARIMI and Shela KARIMI

h. Between February 1, 2001, and at least February 1, 2004, a total of approximately $208,000 transferred from the 9514 account into Fidelity National Bank Account Number █1310 held in the name of HENRICO MK, LLC. (the 1310 account) Thereafter, funds were transferred from the 1310 account into other assets or accounts in the following transactions:

    (1) Between September 20, 2003 and March 18, 2004, a total of approximately $2,047.50 was transferred from the 1310 account to New York Life Insurance policy numbers █8780 and █8796, and

    (2) On September 12, 2003, a total of approximately $50,000 transferred from the 1310 account into Trustmark National Bank Account Number █6301 held in the name of DELTA MK, LLC d/b/a DELTA TRAVEL CENTER (hereinafter the 6301 account).

        (i) Thereafter, between June 3, 2004 and July 30, 2004, a total of approximately $4,000 was transferred from the 6301 account into Fidelity National Bank Account Number █2905 held in the name of SUGAR BEAR, INC

i. Between January 24, 2001 and February 3, 2004, a total of approximately $721,023.69 transferred from the 9514 account into Fidelity National Bank Account Number █1837 held in the name of SUGAR BEAR, INC. (hereinafter the Payroll Account). Thereafter, between February 13, 2001, and April 16, 2004, a total of approximately $193,047.37 was transferred from the Payroll Account into the following five bank accounts:

    (1) Wachovia Bank Account number █5747 held in the name of MALIK KARIMI and Shela KARIMI, an account that later transferred approximately $25,000 into Smith Barney Account █6557,

    (2) Wachovia Bank Account Number █3634, held in the name of MANSOOR KARIMI, which later transferred approximately $3,000 into Smith Barney Account Number █6563;

    (3) SunTrust Bank Account Number █9023 held in the name of VISHWANATH RAO and RITU RAO,

    (4) SouthTrust Bank Account Number █4522 held in the name of

██████████████████████████████; and

(5)   SunTrust Account Number ██████9132 held in the name of
VISHWANATH RAO and RITU RAO

ATTACHMENT A

| | Business Site | Site License Associated Officer | Site Owner Associated Officer | Undocumented Alien Workers Observed by CI 10/6-10/26/2003 | 1st Quarter 2004 GA/DOL Employees Cases | 1st Quarter 2004 Trend/UDAW SSN's reported to GA/DOL | Employees Observed by Appeal During Surveillance 3/16-3/27/2004 | Total Identified Undocumented Alien Workers 1st Quarter 2004 | Undocumented Alien Workers Identified by Agent (SSN) 5/2004 | Undocumented Alien Workers Identified by CI's (at present) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bhsf., 1250 Virginia Avenue College Park, GA | J.P.R., LLC CR/VA, Larry AHSAN | Holden Enterprises, LLC CR/VA, Nino Lintol | 3 | | | 2 | | 1 | n/c |
| 2 | Chevron, 580 McDonough Boulevard Atlanta, GA | J.P.R., LLC CR/VA, Larry AHSAN | Maurice MK, LLC CR/VA, Malik KARIMI | 4 | 17 | 8 | 9 | 22 | 1 | n/c |
| 3 | Aurora, 578 Chappel Road Atlanta, GA | J.P.R., LLC CR/VA, Larry AHSAN | Sugar Bear, Inc | 2 | | | 18 | | 2 | n/c |
| 4 | Aurora, 356 Boulevard NE Atlanta, GA | J.P.R., LLC CR/VA, Larry AHSAN | Boulevard C-Store, Inc CR/VA, Mumtoz KARIMI | 4 | | | 18 | | 3 | n/c |
| 5 | Aurora, 308 Moreland Avenue Atlanta, GA | AAAIR, Inc CRD, Amanullah DEVJI | Maurice MK, LLC CR/VA, Malik KARIMI | 15 | 4 | 1 | 9 | 6 | 1 | n/c |
| 6 | Aurora, 1111 Mainstreet Avenue Atlanta, GA | Rhzy Services, Inc/Eliezion Service Inc CRD, Rafiq DEVJI | Maurice MK, LLC CR/VA, Malik KARIMI | 2 | 44 | 21 | 8 | 3 | 3 | n/c |
| 7 | Chevron, 2431 Peachtree Road Atlanta, GA | Continental Oroi USA, Inc CRD, Abdul HAAMD | Synergy Petroleum, LLC CR/VA, Malik KARIMI | 2 | 8 | 8 | 7 | 7 | 1 | n/c |
| 8 | Aurora, 3644 SE Moreland Avenue Conley, GA | KURA, Inc CRD, Kaibludien HERMANT | Maurice MK, LLC CR/VA, Malik KARIMI | 3 | | | 11 | 11 | 2 | n/c |
| 9 | Aurora, 4866 Ponce De Leon Avenue Decatur, GA | KURA, Inc CRD, Kaibludien HERMANT | Maurice MK, LLC CR/VA, Malik KARIMI | 2 | 11 | 3 | 9 | | 1 | n/c |
| 10 | Aurora, 678 Windy Hill Road Atlanta, GA | FPRK, LLC (Afkh FERO) CR/VA, Syed Ismail HOSSAIN | Maurice MK, LLC CR/VA, Malik KARIMI | 3 | 4 | 2 | 8 | 3 | 3 | n/c |
| 11 | Chevron, 2163 Holcomb Bridge Road Roswell, GA | Horvso Business Service, LLC CR/VA, Vdmumbtb RAO | CR/VA, Malik KARIMI | 6 | 10 | 2 | 10 | 1 | n/c | 4 |
| 12 | Chevron, 2169 Holcomb Bridge Road Roswell, GA | Ismail, Inc (back over Chevron in 2Q2004) CR/VA, Shemul SMAIL | Century MK, LLC CR/VA, Malik KARIMI | n/c | n/c | n/c | n/c | n/c | n/c | 4 |
| 13 | Aurora, 2430 Buford Highway Doraville, GA | Intrastore, Inc (a/k/a In Vrsdmz) CRD, Semud IBRAICH | Century MK, LLC CRD, Malik KARIMI | n/c | 4 | 8 | 10 | 4 | 1 | n/c |
| 14 | Aurora, 464 Ponce De Leon Avenue Atlanta, GA | Overcoast Enterprises, Inc CRD, Nawz BRARIF | Maurice MK, LLC CR/VA, Malik KARIMI | 4 | 3 | | 9 | 9 | 1 | n/c |
| | | | Totals | 33 | 63 | 28 | 111 | 69 | 18 | 4 |

NOTES: CR=Confidential Informant; GA/DOL=GA Department of Labor.
Employee Surveillance conducted by Special Agents from USICE, USDOL and USPIS
Fraud SSN's=SSN's that do not exist, do not belong to the individual in question or are not authorized for employment.



## ATTACHMENT B

## DESCRIPTION OF PROPERTY TO BE SEIZED

A.    When used in this Attachment, the terms "documents" and "records" include but are not limited to, originals, all interim drafts, and each copy of any writing containing any interlineation, deletion, marginal notes, or which is otherwise nonconforming and any tangible items of readable or visual material, whether printed, typed, handwritten, microfilmed, or recorded on tape, disk, or other means of recording, as well as computer records, computer equipment, and components.

B.    The property to be seized includes, but is not limited to the following:

(1)    All computers and all related "computer hardware," which refers to all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.    Hardware includes(but is not limited to) any data-processing device (such as central processing unit or a self-contained "laptop" or "notebook" computer); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, transistor-like binary devices, servers and other memory storage devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

(2)    Any and all "computer software," which refers to digital information which can be interpreted by a computer and any of its related components to direct the way computer systems work. Software is stored in electronic, magnetic, optical, or other digital form.    It commonly includes programs to run operating systems, applications (such s word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

(3)    Any and all "computer-related documentation," which refers to written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware or computer software, or  other related items.

(4)    Any and all "computer passwords and other data security devices," which refer to apparatuses designed to restrict access to or hide computer software, documentation, or date.  Data security devices may consist of hardware, software, or other  programming code. A password is, in general, a string of alphanumeric or other



special characters.  Data security hardware may include encryption devices, chips, and circuit boards.

(5)  All financial records including, but not limited to, books, business records, receipts, notes ledgers, certificates of deposit, bank statements, canceled checks, deposit slips, records of wire transfers, correspondence, cashier's checks, cashier's checks receipts, money orders, money order receipts, official bank checks, records of all checking, saving and other deposit accounts, including all deposits and withdrawals, checks all statements, and any other records of financial transactions;

(6)  All information and documentation concerning the transfer, transportation, mailing, or movement by any method of moneys generated by the KARIMI ORGANIZATION and the Lessees from inside the United States to any recipient inside or outside the country;

(7)  All invoices, correspondence, files and any other records concerning or evidencing business transactions;

(8)  All correspondence including, but not limited to, correspondence concerning any business activities or employees, to include any government agencies or insurance companies;

(9)  All tax records of the KARIMI ORGANIZATION and any individuals or companies associated with the aforementioned company;

(10) All records relating to the acquisition and expenditure of funds, travel, banking, investments, and/or profit distribution;

(11) Personnel records including, but not limited to, personnel files, applications, INS form I-9's, as well as listing of names, addresses, telephone numbers, dates of births, social security numbers, and any alien registration numbers of current and past employees and their dependents, time and attendance records, time cards, work schedules, vacation schedules, IRS Form W-4's, IRS Form 941's, correspondence, termination files/notices;

(12) All employee insurance records including, but not limited to, workers compensation information, applications, withholding authorizations, cards, claims, claim files, eligibility lists, premium statements, summary plan descriptions, contacts, correspondence, information from insurance carriers, Form 5500's trust documents, management instruction letters or memoranda, employee insurance remittance forms, termination files and/or notices, and workers compensation information,

(13) Payroll records including check stubs, paychecks, rates of pay for each employee, IRS Form W-2's, 1099 Forms, state unemployment payment records, correspondence;

(14) All information concerning the employment, harboring, transportation and payment of undocumented aliens;

(15) All information concerning the referral of any employees or prospective employee to other business entities, details of referrals, contacts at other employment agencies, payments made to employment agencies;

(16) All copies of employee documents used to establish identity and employment eligibility; all identity documents, indicia of alienage, including but not limited to, passports, visas, travel documents, seaman's books, crew letters, INS Forms I-94, I-94W, and I 95; and documents supporting entry into the United States by any person referred by The KARIMI ORGANIZATION;

(17) All leases, records of ownership of business assets including real estate, vehicles, and other real and personal property, stock ownership, or other investments;

(18) All documents, correspondence and other writings evidencing the business ownership, financial investments and asset ownership of the businesses of The KARIMI ORGANIZATION and individuals;

(19) All cash proceeds and other negotiable instruments including money cashier checks, and checks made payable to The KARIMI ORGANIZATION, credit card receipts, and deposit slips; and

(20) All information concerning bills and payments of utilities, mortgage payments, rental payments, or other expenses related to houses or rented properties used to house undocumented aliens;

(21) All passports, travel documents, identity documents, to include United States non-immigrant visas, I-94 forms, Social Security forms (including SS05 applications), Social Security correspondence, driver's license forms and driver's license correspondence. Any lists, letters envelopes, or papers containing names, Social Security numbers, addresses, telephone numbers, and dates of birth.

# Operation Sugar Crisp

ERNMENT
BIT



# Operation Sugar Crisp

